UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RICHARD VAUGHN,
VALERIE JENKINS,

                    Plaintiffs,

-vs-                                                    Case No.  6:07-cv-1695-Orl-19GJK

CITY ORLANDO,
OFFICER DENNIS R. SMITH,

                    Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.   Motion for Summary Judgment and Memorandum of Law by Defendants City of
     Orlando and Officer Dennis R. Smith (Doc. No. 49, filed Aug. 4, 2009);

2.   Response to Defendants City of Orlando and Officer Dennis R. Smith's Motion for
     Summary Judgment and Memorandum of Law by Plaintiffs Richard Vaughn and
     Valerie Jenkins, Co-Representatives of the Personal Estate of Mario Jenkins (Doc.
     No. 61, filed Sept. 4, 2009);

3.   Motion for Leave to File Reply by Defendants City of Orlando and Officer Dennis
     R. Smith (Doc. No. 66, filed Sept. 10, 2009); and

4.   Response to Defendants City of Orlando and Officer Dennis R. Smith's Motion for
     Leave to File Reply by Plaintiffs Richard Vaughn and Valerie Jenkins, Co-
     Representatives of the Personal Estate of Mario Jenkins (Doc. No. 67, filed Sept. 11,
     2009).

**Background**

Plaintiffs Richard Vaughn and Valerie Jenkins, as Co-Representatives of the Estate of Officer Mario Jenkins, sued Defendants Dennis R. Smith and the City of Orlando ("City") for violations of Officer Jenkins' civil rights pursuant to 42 U.S.C. § 1983, negligence, and wrongful death. (Doc. No. 38, filed Aug. 25, 2008.) Defendants moved for summary judgment, claiming that Officer Smith is entitled to qualified immunity on Plaintiffs' claim under § 1983, that the City of Orlando is not liable under § 1983, and that the neither Defendant is negligent as a matter of law. (Doc. No. 49.) Plaintiffs filed a timely response opposing summary judgment. (Doc. No. 61.) Defendants then moved for leave to file a reply to Plaintiffs' response, and Plaintiffs opposed such motion. (Doc. Nos. 66-67.)

**I. Undisputed Facts**

On September 24, 2005, Mario Jenkins was working as an undercover police officer for the University of Central Florida Police Department at the Citrus Bowl in Orlando, Florida. (Doc. No. 49 at 2-3.) The Citrus Bowl hosted a football game between the University of Central Florida ("UCF") and Marshall University that evening. (*Id.* at 3; Doc. No. 50-4 at 5-7; Doc. No. 50-7 at 5-6.) During the day, UCF police officers patrolled the tailgating occurring in the parking lots surrounding the Citrus Bowl for incidents of underage drinking, fighting, and sexual assaults. (Doc. No. 50-1 at 30.) In addition, there was heightened concern about fighting and rowdy crowds due to an alleged attack on the opposing team's mascot at a previous UCF football game. (Doc. No. 50-1 at 30; Doc. No. 50-3 at 4-5.)

Officer Jenkins patrolled the Citrus Bowl parking lots wearing plainclothes, including a green shirt.[1] (Doc. No. 49 at 3, 4.) Green is one of Marshall's school colors. (*Id.*) Jenkins carried a gun and a Nextel communications device but no radio or intermediate weapon such as a TASER, baton, or pepper spray. (Doc. No. 50-3 at 5; Doc. No. 50-1 at 31-32; Doc. No. 62-1 at 6.) Jenkins patrolled alone, against the orders of his supervisor, and made a number of arrests during his patrol for underage possession of alcohol. (Doc. No. 49 at 3; Doc. No. 50-1 at 32; Doc. No. 61 at 4.) At approximately 5:00 P.M., Jenkins approached Sonja Raab and asked her for identification to determine whether she was drinking underage. (Doc. No. 49 at 4; Doc. No. 50-9 at 17.) A group of individuals which included Robert McLintock were observed throwing beer bottles and physically attacking Officer Jenkins, even though Jenkins tried to identify himself as a police officer. (Doc. No. 62-5 at 1.) Soon thereafter, McLintock fled, and Jenkins gave chase. (Doc. No. 62-5 at 1.) Jenkins eventually caught McLintock and held a gun to the side of his head. (Doc. No. 61 at 4; Doc. 50-16.) Michael Young, a civilian bystander, wrestled Officer Jenkins to the ground, thinking that Jenkins was a civilian intending to harm McLintock. (Doc. No. 50-5 at 12-13.) A large and loud crowd of civilians was present during the altercation between Officer Jenkins, McLintock, and Young.[2] (Doc. No. 50-4 at 14; Doc. No. 50-5 at 12; Doc. No. 50-8 at 28-29; Doc. No. 61 at 1, 4;

---

[1] When Jenkins first arrived at the Citrus Bowl that day, his supervisor, Major Randall Mingo, observed him wearing a flowery shirt over the green shirt. (Doc. No. 50-1 at 53.) The record does not indicate when Jenkins took off the flowery outer shirt. However, it is undisputed that Jenkins was wearing the green shirt at the time of the incident.

[2] The record does not reflect the actual number of civilians present, although the crowd was further described as "a lot" and "really big." (Doc. No. 50-5 at 12; Doc. No. 50-8 at 28; Doc. No. 50-10 at 13.

Doc. No. 49 at 4-5.)  At some point, Jenkins fired at least one warning shot into the air.[3]  Jenkins

then shot Young once in the abdomen and rose to his feet.  (*Id.* at 7, 9, 12; Doc. No. 50-8 at 15-16.)

On the day of the incident, Officer Dennis Smith, a member of the Orlando Police

Department ("OPD"), patrolled the parking lots and tailgating areas surrounding the Citrus Bowl

on bicycle.  (Doc. No. 50-11 at 10-12.)  Officer Smith wore the standard Orlando Police Department

uniform for a bicycle officer which identified him as a police officer.   (Doc. No. 50-14 at 2.)  He

stopped his bicycle when he overheard part of a civilian complaint to OPD Officer Gonzalez that

a man in the Citrus Bowl crowd had a gun.  (Doc. No. 50-11 at 89, 91; Doc. No. 50-14 at 2.)  Officer

Gonzalez told Officer Smith, "This guy says there's a man in the crowd with a gun.  Go over there,

and I'll call it in."  (Doc. No. 50-11 at 89.)

As he traveled to the scene, Smith heard "pop, pop, pop", and he believed this noise to be

gunshots.[4]  (*Id.* at 89, 92, 95; Doc. No. 50-14 at 2.)  Smith heard some radio traffic concerning the

shots fired, but he could not recall the content of the radio transmissions or the identity of the

speaker.  (Doc. No. 50-11 at 70.)  A crowd of persons, perceived as panicked by Officer Smith, ran

---

[3] By all accounts Jenkins fired at least one warning shot into the air, although it is unclear
how many warning shots in total were fired and whether the warning shot or shots were fired before
Young began attacking Jenkins.  (*See* Doc. No. 50-8 at 14 (hearing one gunshot and then observing
Jenkins chasing McLintock); Doc. No. 50-6 at 13, 17 (seeing one gunshot into the air after Jenkins
had caught McLintock); Doc. No. 50-5 at 10, 20 (seeing at least one gunshot into the air between
the time Jenkins caught McLintock and Jenkins pointed the gun at McLintock's head); Doc. No. 50-
10 at 5 (hearing multiple shots and then traveling to the scene to find Jenkins and Young on the
ground); Doc. No. 62-5 at 1 (claiming that two warning shots were fired after Jenkins caught
McLintock); Doc. No. 62-4 at 1(claiming to observe two warning shots); *id.* at 3 (claiming that
Jenkins fired his gun into the air after Young began to attack Jenkins); *id.* at 5 (claiming to have
heard three warning shots); *id.* at 6 (claiming that Jenkins fired two warning shots after Young began
to attack Jenkins); *accord* Doc. No. 50-11 at 77.)

[4] It is unclear whether this sound was the sound of Jenkins warning shot or shots, Jenkins
shooting Young, or both.  However, it is undisputed that Officer Smith heard multiple gunshots
before arriving on the scene.  (Doc. No. 50-11 at 89.)

by him as he approached the scene. (*Id.* at 76-77, 89; Doc. No. 50-14 at 2.) When Smith arrived, he saw Jenkins pointing his gun at a shot or injured man lying on the ground. (Doc. No. 50-11 at 74, 89-90; Doc. No. 50-14 at 2.) Smith testified that at this point, he was in fear for his own life and the lives of others. (Doc. No. 50-11 at 87; Doc. No. 50-14 at 3.) Smith had no knowledge of the events that previously had taken place between Jenkins, McLintock, and Young. (Doc. No. 50-11 at 107.) Smith testified that he had no knowledge that Jenkins was a police officer when he arrived on the scene, although Smith knew that there were plainclothes police officers in the crowd that day. (*Id.* at 18, 72-73.) Thinking that Jenkins was turning toward him to shoot,[5] Smith shot Jenkins

---

[5] Officer Smith testified that he shot Jenkins out of fear for his own life and that but for Jenkins turning to shoot at him, he would not have shot Jenkins:

> Q:    [W]hen you came upon the scene, . . . were you in fear of great bodily harm for yourself?
>
> A.    Yes.
>
> Q.    Okay.  And why was that?
>
> A.    Because the person I saw standing with a firearm pointing at another person on the ground turned, and began his – to raise his weapon – a handgun, in my direction.
>
> Q.    Did you yell out anything to him?  "Police"?  Anything of that nature?
>
> A.    Not that I recall.
>
> . . .
>
> Q.    Does the fact that Officer Jenkins was a police officer change your mind as to whether or not your life was in danger?
>
> A.    No.
>
> Q.    So . . . if you had known he was a police officer, would you have felt your life was in danger?
>
> A.    Yes.
>
> Q.    So the fact that you had no idea that he was a police officer or not – you still would have shot him?
>
> A.    Yes.
>
> Q.    And why is that?
>
> A.    He was pointing a gun at me.  He was raising a firearm at me.
>
> . . .
>
> Q.    It's your testimony here today that he started to turn towards you with his
>
> (continued...)

without warning twice in the back and once in the rear right arm, resulting in Jenkins' death.  (Doc.

No. 49 at 7, 10; Doc. No. 61 at 6, 9; Doc. No. 50-11 at 105-06.)  Before falling, Jenkins fired two

bullets towards Officer Smith who was dressed in an official police uniform.   (Doc. No. 50-11 at

117; Doc. No. 50-14 at 3.)  The record does not indicate exactly how far Officer Smith was from

Jenkins when he shot Jenkins, but Smith estimated he was approximately 100 feet from Jenkins

when he first arrived on the scene.

> Q.     How far away from him were you at the time you claim he started to turn
>          with his gun?
> A.     I have no idea.
> Q.     More than 100 feet?
> A.     I would say, probably.
> . . .
> Q.     How long after you first came on the scene did Officer Jenkins turn towards
>          you?
> A.     Almost immediately.
> . . .
> Q.     Now, when you took your first shot at Officer Jenkins, where were you
>          standing?
> A.     I have no idea.
> Q.     Okay.  Were you closer than where [you were when you first came on the
>          scene]?
> A.     Probably, yes.

(Doc. No. 50-11 at 63, 67, 68.)

Captain German Garzon and Agent James Ricky Davis of the Florida Department of

Business & Professional Regulation, Division of Alcohol, Beverages, and Tobacco ("ABT") also

---

[5](...continued)
>          gun prior to you shooting first?
> A.     Yes.
> Q.     Had he not turned towards you with a gun, would you have shot him?
> A.     No.

(Doc. No. 50-11 at 62-63; 94-95;105-06.)

patrolled the Citrus Bowl parking lots and witnessed the shooting of Officer Jenkins. (Doc. No. 61 at 5-6; Doc. No. 50-8 at 23.) Captain Garzon arrived at the scene after hearing a gunshot and seeing Jenkins chase McLintock. (Doc. No. 50-8 at 14.) Agent Davis arrived at the scene after hearing multiple gunshots to find Jenkins wrestling on the ground with Young. (Doc. No. 50-10 at 5, 7-8.) Not recognizing either man in the scuffle, Davis pulled out his gun and took aim at Jenkins, the man on top of the other man. (*Id.* at 8, 9.) Garzon did not pull his gun because he was in plainclothes. (Doc. No. 50-8.) Davis and Garzon then heard the shots exchanged between Smith and Jenkins and saw Jenkins fall. (*Id.* at 9; Doc. No. 50-8 at 39.) After hearing those shots, Captain Garzon yelled, "He's a cop." (Doc. No. 49 at 7; Doc. No. 61 at 6.)

At the time of the shooting Captain Garzon did not see Officer Smith. (Doc. No. 50-8 at 21-23.) Agent Davis, three feet away from Garzon, saw in his periphery vision an OPD officer wearing a bike helmet, later identified as Smith. (*Id.* at 23; Doc. No. 50-10 at 9.) Officer Smith stated that he did not know that any other police officers were present at the scene but admitted that he did not look for other officers. (Doc. No. 50-11 at 61.) To Officer Smith's knowledge, OPD officers had no way of communicating with ABT agents in the field. (Doc. No. 50-11 at 99.)

ABT Officer Clement Putter testified that Officers Smith and Jenkins met each other when ABT Officer Clement Putter, Officer Jenkins, and Officer Smith stood around, ate pizza, and chatted about real estate over the course of a "couple of minutes" in the police hospitality tent a few hours prior to the incident. (Doc. No. 50-3 at 6-7, 19-20.) Civilians were not allowed in the police hospitality tent.[6] (*Id.* at 20.) In addition, Officer Jenkins' superior officer, Major Randall Mingo,

---

[6] Because of this restriction on who was allowed in the police hospitality tent, Putter speculated that Officer Smith must have known that Jenkins was a police officer. (Doc. No. 50-3 at
(continued...)

was "100% positive" that Officer Smith met Officer Jenkins at the police hospitality tent. (Doc. No. 50-1 at 20.) However, Officer Smith testified that he did not recall meeting Jenkins prior to the shooting and that he did not know that Jenkins was a police officer until after he had shot Jenkins. (Doc. No. 50-11 at 18, 60, 72-73, 112; Doc. No. 50-14 at 3.)

Agent Davis, who aimed his gun at Jenkins during the scuffle with Young, had spoken with Jenkins ten or fifteen minutes prior to the incident, but Davis did not recognize Jenkins at the scene until after Jenkins had been shot. (Doc. No. 50-10 at 4-5, 12-13.)

## II. Plaintiffs' Contentions

Plaintiffs allege that Officer Smith failed to properly address the scene and that the City failed to adequately train officers on the risk of misidentification of plainclothes officers, failed to properly brief officers on the day of the incident, and failed to adopt policies requiring such actions. (Doc. No. 61 at 2-3.) Plaintiffs assert that Officer Smith was either late to or absent from the briefing given to all patrolling officers earlier that day. (*Id.* at 4.) Plaintiffs also cite findings by the Florida Department of Law Enforcement and the City of Orlando that shortcomings in the Orlando Police Department's Operations Plan contributed to Officer Jenkins' death. (*Id.*)

Plaintiffs also maintain that Officer Smith reasonably should have recognized Jenkins as a police officer because Smith met him earlier that day in the police hospitality tent and Jenkins assumed a characteristic police combat stance at the scene. (*Id.* at 5, 8.) In addition, Plaintiffs argue that Officer Smith's belief that Officer Jenkins was turning to aim the gun at him was unreasonable because Smith shot Jenkins in the back and the back of the arm. (*Id.* at 11.)

---

[6](...continued)
20.)

**Standard of Review**

## I. Summary Judgment, Generally

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

## II. Summary Judgment on Defendant Smith's Claim of Qualified Immunity

In cases brought under Section 1983, consideration of a motion for summary judgment based on qualified immunity is somewhat different than in other cases. In deciding such motion, a court should resolve all issues of material fact in favor of the plaintiff and then answer the legal question of whether defendant is entitled to qualified immunity under that version of the facts. *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *West v. Tillman*, 496 F.3d 1321, 1326 (11th Cir. 2007)). By construing the facts in this manner, the court has "the plaintiff's best case in hand"; therefore, "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity . . . ." *Id.* (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)). Thus, the court "determine[s] the legal issue of whether the defendant was entitled to qualified immunity using the version of facts most favorable to the plaintiff." *Bates*, 518 F.3d at 1239 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

## Analysis

## I. Qualified Immunity for Officer Smith

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, the officer must first show that he acted within his discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute among the parties that Officer Smith acted within his discretionary authority as a member of the Orlando Police Department in choosing to use deadly force. *See Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (defining discretionary authority to include actions undertaken pursuant to the performance of duties that are within the scope of an officer's authority). Accordingly, the burden shifts to the Plaintiffs to show that qualified immunity is not appropriate. *Lee*, 284 F.3d at 1194.

Until recently, a court's analysis of qualified immunity involved a sequential, two-part inquiry. First, the court asked "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from by Pearson v. Callahan*, 129 S. Ct. 808, 818-22 (2009). If so, the court must take "the next, sequential step" which is "to ask whether the right was clearly established." *Id.* In January of this year, however, the United States Supreme Court held that the two prongs of the qualified immunity analysis may be addressed in either order. *Pearson*, 129 S. Ct. at 818. It is appropriate to discuss the steps in the traditional order here. Thus, the Court will first consider whether Officer Smith violated Officer Jenkins' constitutional rights.

The use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures if that force is excessive in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As recently summarized by the

Eleventh Circuit, whether force is excessive is a question of reasonableness in light of the totality of the circumstances:

> The Supreme Court has emphasized that there is no precise test or "magical on/off switch" to determine when an officer is justified in using excessive or deadly force. Nor must every situation satisfy certain preconditions before deadly force can be used. Rather, the particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances. In the end we must still slosh our way through the factbound morass of 'reasonableness.'

*Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The Court must consider only the perspective of a reasonable officer on the scene at the time the events unfolded, without succumbing to the temptation of hindsight. *Garczynski*, 573 F.3d at 1166-67.

Deadly force may be used on a person who poses an imminent threat of serious physical harm to a police officer or others. *Garczynski*, 573 F.3d at 1169; *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003). Moreover, a police officer need not always call out a warning before using deadly force, and the Eleventh Circuit has made clear that it will not second-guess a police officer's split-second decision to use deadly force where lives appear to be endangered:

> For all [the officer] knew, the hesitation involved in giving a warning could readily cause such a warning to be his last. We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing-particularly where, as here, such a warning might easily have cost the officer his life. . . .
>
> It is true that [the officer] did not see a gun in [the suspect's] hands, but it is also true that he could not confirm that [suspect] was unarmed. We will not second-guess the split-second judgment of a trained police officer merely because that judgment

turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer and others.

*Carr v. Tatangelo*, 338 F.3d at 1269 n.19 (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1007-08 (4th Cir. 1994)); *see also Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (requiring a warning before using deadly force only if feasible).

A comparison of the facts of this case to the facts of *McLenagan* as expressly adopted in *Carr* leads to the conclusion that Officer Smith lawfully used deadly force on Jenkins.[7] The shooting officer in *McLenagan* could not determine whether the suspect was armed, yet his decision to use deadly force was lawful. *Carr*, 338 F.3d at 1269 n.19. The situation faced by Officer Smith presents an even stronger case for the use of deadly force because the imminent danger that Jenkins posed to Young was readily apparent to Smith. Officer Smith responded to a complaint that a man in the crowd had a gun. Smith heard at least one gunshot on his way to the scene, and he arrived on the scene to find a man pointing a gun at another man who was lying shot or injured on the ground. (Doc. No. 50-11 at 74, 89-90.) The man with the gun appeared to be in position to fire the gun again. (Doc. No. 50-14 at 3.) Smith did not recognize the man holding the gun, who was dressed in civilian clothing, as a police officer. (Doc. No. 50-11 at 72-73, 107.) In addition, Smith arrived on the scene without any knowledge of what had previously taken place between Jenkins, Young, and McLintock. (Doc. No. 50-11 at 107.) From the totality of the circumstances, Officer Smith reasonably feared for his own life and the lives of others. (Doc. No. 50-11 at 87; Doc. No. 50-14

---

[7] The Plaintiffs point out that the Defendants cite only cases where deadly force was used on suspected criminals, not any "friendly fire" cases in which one police officer shoots another. (Doc. No. 61 at 16.) This distinction is without a difference because police officers and suspected criminals are equally protected by the Fourth Amendment guarantee against excessive force.

at 3.)  These fact support Officer Smith's decision to use deadly force.[8]  *See* (Doc. No. 50-11 at 74,

76-77, 89-90) (describing the scene as perceived by Officer Smith); *McCormick v. City of Fort*

*Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (holding that the Constitution permits the use of

deadly force against a person who poses an imminent threat of danger to a police officer or others).

Officer Smith's failure to warn Jenkins before using deadly force was also lawful.  Smith did

not recognize Jenkins as a police officer.  Jenkins was armed and wearing civilian clothing, Jenkins

was pointing a gun at Young, Young was injured on the ground, Smith had heard a least one shot

from a gun as he approached the scene, and the incident was occurring in a crowded area.  *See* (Doc.

No. 50-11 at 74, 76-77, 89-90) (describing the scene); *Garner*, 471 U.S. at 11-12 (requiring a

warning before using deadly force only if feasible); *Carr*, 338 F.3d at 1269 n.19 (refusing to narrow

police discretion to use deadly force without warning where lives are endangered).  Even though

Smith allegedly saw Jenkins in a stance known to be used by police officers in making an arrest and

allegedly had met Jenkins earlier that day, an officer in Smith's position reasonably could conclude

that Jenkins was not a police officer because Smith was responding to a claim that a man had a gun

in the crowd, not that a police officer needed assistance, and the man with the gun was dressed in

civilian clothing and appeared to be poised to shoot.  (Doc. No. 50-11 at 89-91.)  The fact that Smith

---

[8] The Plaintiffs claim that Jenkins could not have been turning to aim his gun at Officer Smith when Smith shot Jenkins because Jenkins was shot twice in the back and once in the back of the arm.  (Doc. No. 61 at 11.)  However, Plaintiffs do not cite, and the Court does not find, any evidence of record supporting this theory.  Further, this theory is belied by the undisputed fact that Jenkins in fact fired two shots towards Smith after Smith shot Jenkins.  (Doc. No. 50-11 at 117; Doc. No. 50-14 at 3.)  The threats to human life posed by Jenkins at the scene (i.e. that Jenkins was pointing a gun at Young, shots had been fired, Jenkins appeared to be poised to shoot again, and a crowd of bystanders was present) objectively supported Smith's decision to use deadly force, even without consideration of Smith's legitimate fear for his own safety.  (Doc. No. 50-11 at 74, 76-77, 89-90).

did not recognize Jenkins as a police officer after meeting Jenkins briefly earlier that day also did not make Smith's use of deadly force without warning unreasonable. Smith had entered the scene 100 feet from Jenkins.[9] Confronted with an imminent situation where Young's life, his own life, and the lives of others appeared to be in danger, Officer Smith lawfully used deadly force without warning.

Plaintiffs claim that *Wilkins v. City of Oakland*, 350 F.3d 959 (9th Cir. 2003), requires summary judgment to be denied on the issue of whether Officer Smith reasonably used deadly force. In *Wilkins*, two rookie police officers, in the presence of other officers, shot an armed plainclothes officer under the mistaken belief that the plainclothes officer was a civilian threatening another civilian with a gun. *Id.* at 953. The Ninth Circuit held that the issue of whether the shot officer's constitutional rights were violated turned on the reasonableness of the shooting officers' beliefs that the shot officer was a civilian. *Id.* at 955. Because the reasonableness of those beliefs depended on disputed facts, the Ninth Circuit found that summary judgment was not appropriate on the issue of whether the shot officer's constitutional rights were violated. *Id.*

The facts in *Wilkins* are distinguishable from the facts in the instant case. Before the shooting in *Wilkins*, a fellow police officer and the victim told the shooting officers that the victim was a plainclothes police officer. *Id.* at 953. Here, Officer Smith was not advised by anyone that Jenkins was a police officer until after Jenkins had been shot. (Doc. No. 61 at 6, 8.) In addition, Officer Smith knew that a man in the crowd had a gun, had heard a gunshot, and arrived on the scene to find a man in a green civilian shirt pointing a gun at another man wounded on the ground. (Doc.

---

[9] Agent Davis also drew his gun on Jenkins at the scene despite having spoken with Jenkins fifteen minutes before the incident. (Doc. No. 50-11 at 63, 67, 68; Doc. No. 50-10 at 4-5, 12-13.)

No. 49 at 4; Doc. No. 61 at 5, 8.)  Thus, the scene found by Officer Smith was entirely consistent

with his limited knowledge of the situation.  On the other hand, the shooting officers in *Jenkins*

knew that the suspect was wearing a red shirt, and a man with a red shirt was lying on the ground

near the victim, yet they shot a plainclothes officer wearing a grey shirt.  *Wilkins*, 350 F.3d at 953.

Unlike the officers in *Wilkins* who knew what the suspect was wearing and therefore could

distinguish between the suspect lying on the ground in a red shirt and another person nearby, Smith

had no information that would differentiate Jenkins from others at the scene except what he saw, and

what he saw was a person dressed in a green shirt holding a gun over another person wounded on

the ground in the midst of a crowd.  (Doc. No. 50-11 at 72-73, 107.)  Further, the officers in *Wilkins*

had heard a radio report about a suspect fleeing from a stolen jeep at 11:00 P.M. on a city street and

voluntarily joined other police officers from their own police force who already were engaged in the

pursuit of the suspect.  *Wilkins*, 350 F.3d at 953.  In contrast, Officer Smith was the lone police

officer from the Orlando Police Department who had been directed  to investigate a call that a man

had a gun in the crowded tailgating area.  (Doc. No. 50-11 at 70, 89, 91.)  Moreover, the shooting

officers in *Wilkins* were volunteers who took charge of a situation and opened fire, while Smith had

primary responsibility for investigating the incident, as he did not know of any other police officers

responding to the scene.  *Wilkins*, 350 F.3d at 953; (Doc. No. 50-11 at 70, 72-73, 89, 91, 107.)

Finally, although both Officer Smith and the officers in *Wilkins* fired their weapons without prior

warning, Officer Smith shot immediately upon finding his own life, Young's life, and the

bystanders' lives to be endangered, whereas the officers in *Wilkins* fired their weapons after the

victim and another officer told them that the victim was a plainclothes police officer.  (Doc. No. 50-

11 at 74, 76-77, 89-90.); *Wilkins*, 350 F.3d at 953. Because it is distinguishable on its facts, the holding in *Wilkins* is not dispositive of the instant case.

The Plaintiffs also cite *Ngo v. Storlie*, 495 F.3d 597 (8th Cir. 2007), arguing that the reasonableness of Officer Smith's use of deadly force without warning cannot be decided on summary judgment. However, *Ngo* is distinguishable because there the shooting officer shot a fellow officer without warning after the victim kneeled and dropped his weapon. *Id.* at 602-03. Thus, there was no apparent danger to human life requiring a split-second decision to use deadly force.[10] *Id.* at 603. In the instant case, it is undisputed that Officer Smith heard gunshots as he traveled to the scene and arrived at the scene to find that Jenkins aiming his gun at Young. (Doc. No. 50-11 at 74, 89-90, 92, 95.) In accordance with Eleventh Circuit precedent evincing an unwillingness to second-guess the split-second decisions of police officers to use deadly force in life-threatening situations, Officer Smith's use of deadly force without warning against Officer Jenkins was lawful. *Carr*, 338 F.3d at 1269 n.19. Finding that Officer Smith did not violate Officer Jenkins' constitutional rights, the Court does not reach the second prong of the qualified immunity analysis, and Officer Smith is granted qualified immunity. *Garczynski*, 573 F.3d at 1166.

## II. Liability of the City of Orlando under § 1983

Plaintiffs claim that the City of Orlando is liable for a violation of Jenkins' constitutional rights pursuant to 42 U.S.C. § 1983. (Doc. No. 61 at 16-18.) "If a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its

---

[10] Similarly, Plaintiffs' references to *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002), and *Rought v. Porter*, 965 F. Supp. 989 (W.D. Mich. 1996), are inapposite because in both cases the victim did not pose a threat to anyone's life at the time of the shooting. *Curley*, 298 F.3d at 280; *Rought*, 965 F. Supp. at 993.

employees and that failure to train caused the constitutional violation." *Garczynski*, 573 F.3d at 1170 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992)). "Analysis of a state entity's custom or policy is unnecessary, however, when no constitutional violation has occurred." *Id.* Because the Court has found that Officer Smith did not violate Jenkins' constitutional rights by using deadly force, the City is not liable under § 1983. Therefore, summary judgment should be granted for the City of Orlando.

## III. Wrongful Death Claims Against Officer Smith and the City

### A. Wrongful Death from the Use of Deadly Force by Officer Smith

Plaintiffs seek damages under Florida's Wrongful Death Act against Officer Smith arising out of the incident. Florida's Wrongful Death Act allows for recovery when the death of a person is caused by, *inter alia*, negligence or a "wrongful act," which includes the use of excessive force by a police officer. *See Kimbrough*, 2006 WL 3335066, at *8 (construing § 768.19, Fla. Stat.). Any liability under state law attributed to Officer Smith for the use of excessive force must arise from the intentional tort of battery, not negligence. *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996). Florida also recognizes a cause of action for "the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (citing *Sanders*, 672 So. 2d at 48); *see also Trianon Park Condo. v. City of Hialeah*, 468 So. 2d 912, 920 (Fla. 1985) (stating that the common law duties of care apply to police officers' handling of firearms); *Mazzilli v. Doud*, 485 So. 2d 477, 479 (Fla. 3d DCA 1986) (upholding negligence claims arising from law enforcement's failure to exercise reasonable care when utilizing firearms). Both a claim for battery arising from excessive force and a claim for the negligent handling of a firearm turn on whether the amount of

force used was reasonable under the circumstances. *See Sanders*, 672 So. 2d at 48 ("Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer reasonably believes the force to be necessary to defend himself or another from bodily harm while making the arrest.") (internal quotations omitted); *Mazzilli*, 485 So. 2d at 479 (finding liability for negligence where the shooting officer "did not reasonably believe his use of force to be necessary either to defend himself or to effect the arrest of felons."). As discussed above, Officer Smith reasonably used deadly force to defend Young, himself, and others from the apparent threat of serious bodily injury posed by Jenkins. Thus, summary judgment should be granted for Officer Smith on the Plaintiffs' claim of negligence.

### C. Wrongful Death from the City's Negligent Failure to Train Officers

Just as the use of excessive force by a police officer is a wrongful act under the Florida Wrongful Death Act, the City's deliberate indifference to the training of its officers on the risk of misidentification of plainclothes officers also constitutes a wrongful act. *Kimbrough*, 2006 WL 3335066, at *8. However, the Plaintiffs' claim of negligence against the City must fail because the City owed Officer Jenkins no duty of care. The Florida Supreme Court has held that any action or inaction on the part of governmental officials or employees relating to the enforcement of laws or the protection of the public safety cannot give rise to governmental tort liability "because there has never been a common law duty of care with respect to these legislative, executive, and police power functions, and the statutory waiver of sovereign immunity did not create a new duty of care." *Trianon Park Condo.*, 468 So. 2d at 921. Because the City's decisions concerning the training and briefing of its police officers relate to the enforcement of laws and protection of the public safety, the Plaintiffs cannot sue the City on such matters. *See Lewis*, 260 F.3d at 1266 (interpreting Florida

law and holding that negligent training claims implicate discretionary governmental functions and that cities are immune from tort liability on such claims). Thus, the City should be awarded summary judgment on the Plaintiffs' claim of negligent failure to train and brief its police officers.[11]

## IV. Motion for Leave to File Reply

Defendants seek leave to file a reply to Plaintiffs' response to the Motion for Summary Judgment, claiming that the Plaintiffs' misstatements of applicable facts and law require clarification. (Doc. No. 66 at 1-2.) The numerous reports, depositions, and affidavits submitted by the parties have been reviewed. (Doc. Nos. 50, 62.) The Court must view all facts and draw all reasonable inferences in the Plaintiffs' favor for purposes of the Defendants' Motion for Summary Judgment. *Anderson*, 477 U.S. at 255; *Case*, 555 F.3d at 1325. When considering the facts, the Court is also bound by the evidentiary limitations imposed by Rule 56(e) of the Federal Rules of Civil Procedure. Thus, additional briefing by the Defendants as to the applicable facts is unwarranted. The Court also declines the Defendants' request to further brief the applicable law.

### Conclusion

Based on the foregoing, the Motion for Leave to File Reply by Defendants City of Orlando and Officer Dennis R. Smith (Doc. No. 66) is **DENIED**. The Motion for Summary Judgment by Defendants City of Orlando and Officer Dennis R. Smith (Doc. No. 49) is **GRANTED.** The Clerk shall enter Final Judgment in favor of Defendants and against Plaintiffs.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on September 29, 2009.

---

[11] Having granted summary judgment for the Defendants on each state law claim, a discussion of sovereign immunity is unnecessary. *See Lewis*, 260 F.3d at 1262 ("[T]he question of the applicability of sovereign immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (quoting *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989)) (internal quotations omitted)).

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record